Stuart A. Hallam
PO Box 210996
Auke Bay, Ak  99821
Telephone: 907.209.8587
stuart@ltdalaska.net

*In pro per* as Relator

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. Stuart Hallam, | ) | Case No. 1:23-cv-00348 |
| | ) | |
| Plaintiff. | ) | **REPLY IN SUPPORT OF RULE 60** |
| | ) | **MOTION FOR RELIEF FROM** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| BRETT DEUTER, an individual; DEUTER CONSTRUCTION, LLC, an Idaho limited liability company; and ENLIGHTEN, LLC, an Idaho limited liability company dba Enlighten Construction Services and dba EnlightenHome, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I.    **INTRODUCTION**

Relator Stuart Hallam (hereafter Relator or pronoun) filed the underlying motion to void the consent agreement based upon fraud and misrepresentations, pursuant to FRCP 60(b)(3) and (6), and the Court's inherent power to grant remedies to prevent injustice. As plead, the misrepresentations and fraud were by both the Defendants and the Government's representative, Elliot Wertheim, Assistant United States Attorney (hereafter Wertheim or AAG).

The stated intent of Congress in amending the FCA cannot be over emphasized: (a) create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction: and (b)  and to encourage the

private bar to commit legal resources to prosecuting fraud on the Government's behalf. Here, the USA has treated the Relator as adversary, and aided Defendants by their inaction is an understatement, all adding up to the opposite of encouraging Relators to commit resources to the benefit of the Government.

None of the Defendants filed a response to the motion. The United States Attorney's (hereafter USA) response and objection is self contradictory and misleading. The response attempts to evade or dismiss the specific misrepresentations and fraud, offers no meaningful argument regarding the facts, and is not supported by an affidavit. The USA did find time to try to dig up dirt on me, seeking to muddy waters with irrelevant speculation from decades old litigation.

The USA attempts to portray Relator as "upset" due to Defendant's inability to pay, and that I knew or should have known/lacked due diligence in determining that Deuter could not pay. This position is beyond self contradictory, and flies in the face of the record, and Candor to the Court. The USA refuses to submit an affidavit by Wertheim refuting my specific allegations, where as I have sworn that I signed off on the Consent Agreement only after being assured by AAG Wertheim that the agreement would be pulled if Deuter had misled him, and that Wertheim insisted my concerns were unfounded because he knew what I did not, and had "run all accounts to ground." The USA literally argues against itself here: Wertheim saying trust him because he had information I do not and "ran all accounts to ground", and the USA now arguing that I knew based on my objections, or should have known but lacked due diligence.

I am indeed "upset": upset that the AAG Wertheim's used misrepresentations and fraud in order to get me to abandon my objections, and dealt with me in bad faith, including trying to unilaterally waive my statutory right to fees and costs.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                    **2**

The USA's attempts to dismiss communications directly between Wertheim and myself as "hearsay" dishonestly states "Relator is interpreting something said by his attorney, which in turn is an interpretation by his former attorney." Dk[1]t. No. 57 at 15. No such happening occurred, or was put forth in the motion. Regarding what was conveyed to my legal representative to get me to sign the agreement, at a minimum I would assert it falls under Rule 801(d), Admission of Party Opponent. Regardless, the following statements of fact are uncontroverted, including but not limited to:

   a.  I signed off on the Consent Agreement only after being assured by AAG Wertheim that the agreement would be pulled if Deuter had misled him;

   b.   Wertheim misled me;

   c.  Deuter misled Wertheim;

   d.  Deuter lied to secure the agreement, and had no intention of fulfilling his obligations as evidenced by his refusal to make even the initial payment, and refusing offers on the Hailey property that would have allowed him to do so;

   e.  Wertheim sought to negotiate away my rights to fees and costs without consult;

   f.  Wertheim made it clear to me, directly, that if I objected it would be made fiscally costly to me.

As specified in the underlying motion, there were multiple financial accounts Deuter refused to produce in the state court action, in violation of multiple orders. My point was simple: unless Wertheim had those records and they proved the Deuter could pay, the "deal" was worthless.

_____

[1] I was abroad when filing the underlying motion, thus did not have access to a notary, thus used an electronic signature. To the extent the USA wants to dismiss the authenticity my affidavit due to electronic signature, Rule 11 still applies.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                    **3**

Wertheim told me he was confident in the deal, expressly stating his belief was based on having "run all accounts to ground."  Relator's direct communications with AAG Wertheim included:

> Accordingly, I asked the AAG if he had those [withheld] records. He refused to say. I pointed out that all the records I knew of precluded the feasibility of the agreement. The AAG categorically stated, at least twice, that he had "run all accounts to ground", and that the agreement was sound.
> Based on AAG Wertheim's words, at least one of the following must be true:
>> (1) Wertheim did not "run all accounts to ground"; or
>> (2) The records showed the Deuter had no ability to turn a profit, much less make the quarterly payments.

Dkt. No. 51 at 9.

The USA's argument about additional benefits to the Government are specious. Whereas the USA asserts Rule 60 is not appropriate for where a decision later proves to be unwise, unless they are suggesting that trusting an United States Attorney's word is "unwise", that too is specious.

## II.      NO INTENT TO PROCEED *PRO SE,* CONDITIONAL ORDER

Relator has no illusions regarding the requirements of filing FCA claims, thus has no intent to try to proceed *pro se.* The Court has within its power to issue a Conditional Order voiding the Consent agreement, with that condition being Relator proceeding with counsel.

Unless and until the Court voids the Consent Agreement there is no requirement for Relator to have representation of counsel, nor incurring its inherent costs.  As detailed in my motion, the USA has prejudiced me greatly financially, doing so in direct contradiction to the FCA and its stated intent. As Relator,  I am already invested >$40k to the benefit of the Government. The bad faith actions of the USA in trying to sign away my right to fees and costs, and to minimize my share of the recovery cost me thousands of dollars, needlessly.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                                        **4**

### III.    IN A NUTSHELL: WHAT THE USA WAS HANDED

The USA's response and objection makes light of my assertion that the complaint was both fully formed and ready for formatting for submission as a summary judgment. For the Court's convenience, the following correspond to numbers 40 through 84 of the complaint.[2]

40.  On March 23, 2020, Deuter Construction, through Brett Deuter, applied for an EIDL from the Small Business Administration ("EIDL Application").  A true and correct copy of the EIDL Application is attached as **Exhibit A**.

41.  The EIDL Application contains a certification as to truthful information that states "[b]y signing this application, you certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future."

42.  In the EIDL Application, Deuter Construction Represented that it had twelve (12) employees and that Brett Deuter had never filed for bankruptcy.

43.  Brett Deuter had filed for a Chapter 7 bankruptcy in 2007.

44.  As part of the EIDL Application, Brett Deuter answered "No" to the question of whether "[i]n addition to ownership in DEUTER CONSTRUCTION, LLC, does this individual owner own more than 50% of, or is this individual owner a Managing Member or General Partner of a corporation, partnership, limited partnership, or LLC?"

45.  On April 10, 2020, Brett Deuter reinstated Enlighten after it had been administratively dissolved by the Idaho Secretary of State.

---

[2] I left the text verbatim, including the exhibit references. I do not wish to burden the Court by including the scores of pages of exhibits here, as they are uncontested and readily available to the Court. Additionally, the banking transfer references can be confirmed utilizing Exhibit B of the underlying motion at Dkt. No. 51.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                5

46.  On April 14, 2020, Deuter Construction received a $7,000 advance on its request for EIDL funds.

47.  On the same date it received the $7,000 advance, Deuter Construction transferred $5,000 to Brett Deuter's personal account.

48.  On April 23, 2020, Deuter Construction was awarded an EIDL of $496,600.  When added to the $7,000 advance, Deuter Construction received a total of $503,600 in EIDL funds.

49.  Almost immediately upon receiving the EIDL funds, Deuter Construction transferred all of those funds into Enlighten's account. Because the Deuter Construction account had an account balance of negative $245 before the bulk of the loan funds were deposited on April 23rd, only $496,355 was moved into Enlighten's account.

50.  After the EIDL funds were transferred to Enlighten's account, the Deuter Construction bank account ended April 23, 2020 with a balance of negative $70.

51.  Also on April 23, 2020, Brett Deuter completed an application for a PPP loan on behalf of Deuter Construction ("First PPP Application").  A true and correct copy of the First PPP Application is attached as **Exhibit B**.

52.  The First PPP Application contained several different documents, including a promissory note executed by Brett Deuter, a borrower's closing certification, a borrower's authorization to deposit loan proceeds, a certification of beneficial owners, a loan calculation certification, and other statements and documentation relating to Deuter Construction.

53.  The First PPP Application included several representations made on behalf of Deuter Construction.

54.  The First PPP Application stated that Deuter Construction had seven (7) employees as of February 15, 2020, and that Deuter Construction expected to have the same number of employees by June 30, 2020.

55.  The First PPP Application stated that the average monthly payroll for Deuter Construction was $42,598.00, and that the annual wages and tips paid by Deuter Construction were $458,448.

56.  The First PPP Application also stated that of the loan amount sought, $1,500 was to be spent on utilities, $70,000 on payroll, $7,500 on rent, and $9,000 on group healthcare.

57.  The First PPP Application also contained several certifications that were agreed to and initialed by Brett Deuter.

58.  On the First PPP Application, Brett Deuter certified that he owned 100% of Deuter Construction.

59.  On the First PPP Application, Brett Deuter also certified that, as the applicant, he was not "an owner of any other business, or [did not] have common management with, any other business."

60.  On the First PPP Application, Brett Deuter certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects," and that he "underst[oo]d that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

61.  On May 12, 2020, $106,400 in PPP funds requested in the First PPP Application were deposited in *Enlighten*'s bank account ("First PPP Loan") and the lender of record was Customers Bank.  On May 13, 2020, the $106,400 was transferred from Enlighten's account to Deuter Construction.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                          **7**

62.  On May 28, 2020, roughly a month after receiving Deuter Construction's EIDL funds, Enlighten purchased a five-acre residential property located at 206 Bannock Drive in Hailey, Idaho.  The purchase price was $150,000, and Enlighten would not have had sufficient funds for closing on the purchase without Deuter Construction's EIDL funds.

63.  Deuter Construction ceased all business operations in December 2020.

64.  On or about December 22, 2020, all of Deuter Construction's employees became employees of Enlighten.  After December 22, 2020, Deuter Construction had no employees.

65.  On January 26, 2021, Brett Deuter completed a second application for a PPP loan on behalf of Deuter Construction by filling out a Paycheck Protection Program Second Draw Borrower Application Form ("Second PPP Application").  A true and correct copy of the Second PPP Application is attached as **Exhibit C**.

66.  On the Second PPP Application, Brett Deuter signed and initialed several certifications.

67.  On the Second PPP Application, Brett Deuter certified that Deuter Construction "was in operation in February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes . . . ."

68.  On the Second PPP Application, Brett Deuter certified that:

> The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

69.  Brett Deuter also certified that, before receiving a Second PPP Loan, he would have used the full amount of the First PPP Loan only for eligible expenses.

70.  The Second PPP Application contained a borrower's certification that was signed by Brett Deuter.

71.  On that borrower's certification, Brett Deuter certified that Deuter Construction "is and since February 15, 2020, has been duly formed, validly existing, operating, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business . . . ."

72.  Also on that borrower's certification, Brett Deuter agreed that Deuter Construction "will not, without Lender's consent, change its ownership structure, make any distribution of company assets that would adversely affect its financial condition, or transfer (including pledging) or dispose of any assets, except in the ordinary course of business."

73.  Brett Deuter further certified that he understood knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, and that Deuter Construction, as the borrower, was in compliance with all laws, rules, regulations, guidance, and orders applicable to the PPP and PPP second draw loan program.

74.  On January 27, 2021, the Second PPP Application was approved and $100,018.72 was deposited directly into Enlighten's account ("Second PPP Loan").  The Lender for the Second PPP Loan was Idaho First Bank.  That same day, Brett Deuter wrote a check for $5,774.19, and the next day he transferred $5,000 to his personal checking account.

75.  On May 13, 2021, Brett Deuter applied for forgiveness of the First PPP Loan.

76.  When applying for forgiveness of the First PPP Loan, Brett Deuter certified that Deuter Construction had nine employees as of May 13, 2021.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                    **9**

77. Deuter Construction did not have nine employees on May 13, 2021; it had zero employees on that date.

78. On May 26, 2021, the First PPP Loan was forgiven.

79. On June 15, 2021, Deuter Construction was administratively dissolved by the Idaho Secretary of State.

80. On October 13, 2021, Brett Deuter applied for forgiveness of the Second PPP Loan ("Second PPP Loan Forgiveness Application"). A copy of the Second PPP Loan Forgiveness Application is included in **Exhibit D.**

81. When applying for forgiveness of the Second PPP Loan, Brett Deuter certified that Deuter Construction had eight employees at the time of the loan application and eleven (11) employees on October 13, 2021.

82. Deuter Construction did not have eight employees at the time of the loan application nor 11 employees on October 13, 2021; it had zero employees on either date.

83. On the Second PPP Loan Forgiveness Application, Brett Deuter certified that $101,246.53 of the Second PPP loan was spent on "Payroll Costs" for Deuter Construction between the loan disbursement date of January 26, 2021 and October 13, 2021.

84. On the Second PPP Loan Forgiveness Application, Brett Deuter certified that "[t]he Borrower has complied with all requirements in the Paycheck Protection Program Rules" and that "[t]he information provided in th[e] application is true and correct in all material respects."

85. The Second PPP Loan amount of $100,018.72 was forgiven on October 18, 2021.

The complaint does not include the fact that Deuter also fraudulently sought to have the EIDL forgiven, including an email dated October 26, 2022 stating:

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**          **10**

> My company received a covid EIDL loan (#3331347207) in 2020.
> Unfortuneately[sic] my company went out of business due to insolvency in
> 2021 and i'm not sure what to do. I believe i gave a personal gurarantee[sic] to
> the loan so i think i still have to pay it back, but not certain and currently am
> not in a position to afford the payments. Is there any relief available to people
> in my position?

This was ten months into the state court action. The point here is the further verification of

Deuter's zero remorse for his actions, and his unending stream of frauds and sense of

entitlement.

Also not included in the complaint are the trial admissions to the frauds detailed above.

The trial tapes had not been transcribed, and there was no cost benefit to having them done since

the admissions were also procured in Deuter's two depositions.

The above speaks for itself as to the USA's lack of veracity in the claims surrounding

applicability of summary judgment, and falsely claimed "additional benefits" of the consent

agreement.

## IV.    THE CONSENT AGREEMENT IS INHERENTLY UNREASONABLE

In one breath, the USA argues that the judgment amount is reasonable because it makes

the government whole and requires that Defendants pay a penalty. In the next breath, they argue

my motion is an empty exercise because Defendant's can not pay. So how is the Government

made whole? Why were accounts not frozen, assets not secured, seized, or clawback

implemented?

The USA portrays the Consent Agreement as reasonable, and wants the Court to believe

that setting it aside would be an "empty exercise", citing *Teamsters, Chauffeurs, Warehousemen*

*& Helpers Union, Local No. 59 v. Superline Transp. Co., Inc.*, 953 F.2d 17, 20 (1st Cir. 1992);

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                    **11**

*accord Justus v. Clarke*, 78 F.4th 97, 105 (4th Cir. 2023*)*. Dk³t. No. 57 at 7-8. It is not an empty exercise to Relator, as detailed below, which are interconnected with  the USA's contentions regarding claimed additional benefits to the Government that could not be obtained through summary judgment are meritless.

USA goes on to argue "Additionally, and independently, voiding the Consent Judgment is an empty exercise because a larger judgment will provide no added benefit. Defendants cannot even pay the Consent Judgment." *Id*. Wertheim and the present Assistant United States Attorney William Humphries can not agree amongst themselves whether Defendant's have the capacity to pay. Yet Wertheim appears to have gone out of his way to ensure I would never so much as recover my fees and costs, while openly stating his concern that Deuter not be "left destitute." Stated otherwise, Wertheim was more concerned that Deuter be left in a better condition than before committing his frauds. It is not Relator's word versus Wertheim's, we can play the tapes for the Court.

The reasons proffered by the USA fail as well. Firstly, if the USA believed Defendant's could not pay, why did they argue the opposite to Relator to get me to sign? Why not freeze accounts and secure assets? Why not condition lesser amount do upon timely payments? To listen to the USA now, they say I should have known Defendants could not pay, so should have expected immediate default. As a result of USA's failure to secure assets in the consent agreement or after, the costs of trying to recover the judgment through default collections greatly exceed any funds they have recovered to date.

---

[3] I was abroad when filing the underlying motion, thus did not have access to a notary, thus used an electronic signature. To the extent the USA wants to dismiss the authenticity my affidavit due to electronic signature, Rule 11 still applies.

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                    **12**

A.    **The amount of the judgment is not reasonable and encourages fraud.**

The USA now appears to argue it knew the judgment was uncollectible. Per my sworn statements, this is the opposite of what they argued to me to sign the agreement as opposed to making them justify it to the Court. It also highlights the malfeasance of not securing as many business and personal assets as possible. The agreement is all carrots, no stick.

Collectability aside, the amount is not close to reasonable for a variety of reasons, which I have detailed more than once in various communications with the USA's office, including both Wertheim and Humphries. Foremost amongst the reasons is that there is supposed to be a deterrent to fraud against to Government, not rewarding it. This agreement very much rewards fraud, thus encouraging it. Defendants have profited more in saved interest costs than the underlying >$700k. Defendants profit by thousands of dollars a week by being in default. That is hardly a deterrent. The fact that Defendants have five repeated frauds, and sixth attempted, shows the opposite of remorse, further illustrating this reality.

The USA misrepresents my points regarding the state action throughout their response. My point is that this case did not come cheaply, and that the USA was indeed handed what was described by Holland and Hart as a fully formed complaint, ready for summary judgment.

B.    **The claimed additional benefits of the consent judgment are disingenuous.**

1.    **The agreement did not save resources.**

Predictably, Deuter/Defendants never made even one payment. Additionally, they did not even try to make the initial payment, which would have required the sale of the Hailey property procured with EIDL funds. In fact, Deuter rejected offers made on the property.

Claims of saving the costs of protracted litigation do not pass a sniff test, especially since I handed the USA Deuter's sworn admissions and conclusive documentation in hand. I was also

more than willing to have my former attorneys handle the summary judgment motion. **All** were

submitted by Deuter in violation of the FCA ***after*** he closed Deuter Construction, and that he

declared it insolvent to dead beat numerous debts, further detailing the overtness of his

repetitive frauds:

> (1) the Second PPP application;
> (2) Forgiveness application for First PPP;
> (3) Forgiveness application for Second PPP;
> (4) Request to SBA in effort for relief from EIDL.

The time and effort the USA spent in negotiating with Deuter and trying to convince me to waive

my right to fees and cost easily surpass what the drafting of the summary judgment motion

would require. As noted above, the facts were not simply indisputable, Deuter was forced to

admit the frauds under oath already. There are are no possible genuine issues of material fact to

be offered. I hold that section III, above, speaks for itself and do not wish to belabor the point.

The USA's assertion in citing "the government would continue to incur enormous internal staff

costs" is not credible. Dkt. No. 57 at 10.

### 2.    The admissions to the frauds were already in hand, not procured by USA.

The following precludes candor: "Defendants admit to wrongdoing in the Consent

Judgment, which has repercussions for Defendants, including public embarrassment (press

release)." Dkt. No. 57 at 11. Firstly, the state court judgment was already public knowledge.

Secondly, Deuter's embarrassment does not make the tax payer whole. Thirdly, from the USA's

handling of the matter, it would appear that the press release was their goal, not recovering funds

for the tax payer. The USA put more effort into the press release than securing Deuter assets,

verifying Defendants' ability to make the quarterly payments, or verifying the value of the Hailey

property.

### 3.    11 U.S.C. § 523(a)(2) does not require Defendants' agreement

Being *pro se* does not make me incapable of reading. 11 U.S.C. § 523(a) already

precludes discharging debts from fraud, and the binding precedent of *Bartenwerfer v. Buckley,*

598 U. S. 69 (2023). Proffering to the Court that "In sum, the Consent Judgment provides

important and advantageous bankruptcy nondischargeability provisions that may not have been

obtained through summary judgment" is contemptuous. *Id.*

### 4.    The USA offers smoke and mirrors regarding collections.

The USA offers obfuscations versus genuine argument in its section on collections. Dkt.

No. 57 at 12.

A possible advantage to a Consent Agreement is the ability to have the Defendant

surrender assets. Otherwise, the collection methods are the same as those available to other

judgments, be they through summary judgment or trial.

My explicit point was that the USA refused to freeze accounts, or secure assets other than

the Hailey property, by way of the Consent Agreement. Yet it gave Defendants every opportunity

to dispose of assets, and refused to seek clawback or disgorgement. It also ignores what Deuter

transferred to his ex-wife in the divorce, let alone the "generous offer" he referred to in those

proceedings, *after* the consent agreement was signed.

### 5.    USA's double talk on ability to pay.

It remains uncontroverted that: (1) Wertheim explicitly told me he would not seek to

secure Defendants assets because he wanted Deuter in business to pay back the government; (2) I

told Wertheim that the records I had showed no such ability to pay, that asset seizure was the

wise course, and (3) that Wertheim told me that his information showed the deal was viable,

including the line that he knew better because he had "run all accounts to ground."

**REPLY IN SUPPORT OF RULE 60 MOTION (DKT. 51)**                    **15**

It is uncontroverted that Wertheim tried to force me into a deal that would leave me at well under 5% of recovery if Wertheim's plan to deprive me of seeking fees and costs was included. He tried to low ball my contributions to the "finders fee" standard of 15%, which is for those simply bringing FCA frauds to the Government's attention, not those who bring sworn admissions to the frauds, including all necessary documentation. If the USA believed recovery was so limited, why did Wertheim put up such a fight, including telling me I was taking money from the tax payer? Wertheim's argument for attempting to shortchange me on the relator percentage was that a higher percentage was for instances such as where relators had to wear wires. That is cognitive dissonance at a minimum: a wire gets you evidence you hope will lead to a confession or be otherwise conclusive. In this case, I handed the Government Defendants' sworn admissions, and corresponding conclusive evidence.

## V.    FRAUD BY DEFENDANTS AND WERTHEIM IS REASON FOR RULE 60 APPLICABILITY, NOT UNWISE DECISION BASED ON SAID FRAUD

The USA conveniently neglects to mention it refused to share pertinent information with me regarding the fiscal reality of Defendants. Additionally, Wertheim plainly lied to me about what he knew, and/or did not perform the due diligence he assured me he had. Further still, Wertheim's stated concern about not leaving Deuter "destitute", or or his refusal to freeze accounts or seize business assets so Deuter could stay in business, preclude a good faith argument here that I knew, or should have know, Deuter could not pay. Again, it was Wertheim who told me he had information showing Deuter could pay, yet refused to tell me what that information was. That puts the lie to the USA's knowingly false assertion now that "Second, Relator was fully informed of all material facts." Again, let the USA play the tapes for the Court. Dkt. No. 57 at 16.

Wertheim then stating he was going to force the agreement upon me anyway, to my great expense, can easily be described as fiscal coercion.  This is the opposite of the FCA's stated intent to create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

## VI.    CONCLUSION

Based on the facts above and the intent of the FCA, the Consent Judgment should be *conditionally* voided,  with the condition being that Relator procure counsel within 90 days to then file a motion for summary judgment, and seeking the full 30% of any recovery.

If not for the misrepresentations and fraud by Wertheim, the USA would have had to justify this deal to the Court and explain how it was in the interest of the tax payer, and how it furthers the FCA's stated goal of creating incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

///

///

///

If left to stand, the consent agreement works again each of those objectives, and

*continues to* reward the Defendants numerous frauds. Had AAG Wertheim's words been true and

accurate regarding his access to facts showing Defendants' ability to pay, the consent agreement

would be at well on the way to being fulfilled, and me able to have move on with my life. Had

Wertheim's words regarding voiding the deal if Deuter had mislead him, summary judgment that

was not beneficial to Defendant's would be in hand. Instead, Deuter continues his frauds, as

evidenced by at least three more cases against him in state court in recent months.


RESPECTFULLY SUBMITTED this 29th day of December 2025,


By: /s/ *Stuart A. Hallam*

Stuart A. Hallam
*Pro se*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of December, 2025, I submitted the forgoing via CM/
ECF system which sent a Notice of Electronic
Filing to the following person(s):
Michael Pogues
Gravis Law, PLLC (mpogue@gravislaw.com)
Attorney for Deuter Construction, LLC and Enlighten, LLC
Justin D. Whatcott
Robert Firpo (robert.Firpo@usdoj.gov)
William M. Humpries (bill.Humphries@usdoj.gov)
Assistant U.S. Attorney's Office Attorneys for United State of America

Stuart A. Hallam
PO Box 210996
Auke Bay, Ak  99821
Telephone: 907.209.8587
stuart@ltdalaska.net

*In pro per* as Relator

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. Stuart Hallam,<br><br>  Plaintiff.<br><br>vs.<br><br>BRETT DEUTER, an individual; DEUTER CONSTRUCTION, LLC, an Idaho limited liability company; and ENLIGHTEN, LLC, an Idaho limited liability company dba Enlighten Construction Services and dba EnlightenHome,<br><br>  Defendants. | Case No. 1:23-cv-00348<br><br>**AFFIDAVIT OF STUART HALLAM** |

I, Stuart Aaron Hallam, being first duly sworn, on oath, state:

1. I am Relator in this matter.

2. All factual assurances asserted in the attached reply memorandum are based on my own personal knowledge.

3. What was communicated to me by Elliot Wertheim, through my counsel Christopher McCurdy, was "Elliott said if Deuter misrepresented anything in their negotiations the deal is off."

4. Also communicated by McCurdy, "I won't try to justify Elliot's actions, but based on what he told us, the government was going to push through the settlement with the court, even if it wasn't the best deal."

5. Wertheim specifically told me his refusal to seize or otherwise secure business assets was because he wanted Deuter to be in business to pay back the government.

6. When I told Wertheim that all records I saw showed Deuter had no hope of paying his existing debts, let alone making the quarterly payments, Wertheim responded that it was feasible based on what he had obtained.

7. I specifically asked Wertheim if he had procured records for a number accounts Deuter never produced in the state court action, in spite of numerous orders to due so.

8. Wertheim refused to confirm receipt of the documents from those accounts.

9. When I pressed Wertheim on those documents, pointing out that all other accounts showed Deuter had no ability to make quarterly payments, thus asking what made him so sure Deuter could pay, he responded that he had everything and "ran all accounts to ground."

10. Wertheim refused to state what records he was provided to conclude the quarterly payments were feasible.

11. In accordance with 5 U.S.C. § 552a(b), I did not ask for copies of the records he referred to, just what accounts they were.

12. Following this Court's Order for Fee and Costs, Deuter's counsel asked to set up a payment schedule.

13. Based upon the fact that Deuter had already failed to make any of the payments to the government that already well overdue, I refused.

14. No sooner had Deuter come to an agreement with the AAG when he pulled the Hailey property off the market in 02 September 2024, according to relator records.

15. Deuter refused offers on the Hailey property in December 2024.

16. The Hailey property was eventually delisted in the spring, on or about "4/3/2025", according to Zillow.

17. The property was pulled off the market again on or about "11/1/2025", according to Zillow.

DATED this 17th day of December 2025,

Stuart A. Hallam

SUBSCRIBED AND SWORN to me this __17__ day of December 2025.

SILVIA N LOPEZ
Notary Public  State of Utah
My Commission Expires on:
May 22, 2029
Comm. Number: 743299

Notary Public for Idaho  UTAH

Residing at: 2299 S Highland Dr SLC

My Commission Expires: 05/22/2029